IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| YOLANDA SALES, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Civil No. 3:13-0064 |
| | ) | |
| INVENTIV HEALTH, INC., | ) | Judge Trauger |
| | ) | JURY DEMAND |
| **Defendant.** | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES now Plaintiff, Yolanda Sales, by and through counsel to respond in opposition to Defendant's Motion for Summary Judgment in accordance to Rule 56 of the Federal Rules of Civil Procedure. As a preliminary matter, Plaintiff hereby conceded her Equal Pay Act claims against Defendant but maintains that she was discriminated against on the basis of her race and disability, and retaliated against for reporting the harassment to her supervisors.

### I. FACTUAL SUMMARY

Plaintiff Yolanda Sales ("Sales") was hired by Defendant inVentiv Health, Inc. ("inVentiv") in June of 2006, as a full-time sales representative ("rep") on their IMPAX contract (Defendant's Disc Response Bates No. INV_0000295). While an employee at inVentiv, she received annual raises, and a promotion to Senior Specialty Sales Rep in July of 2009. (Sales Dep 123:03-05; 125:21-25).

Sales alleges that inVentiv discriminated against her on the bases of disability and race. (Sales Dep 181:03-08). Her disability is ADHD, depression, anxiety, and dyslexia. (Sales Dep 181:09-10) She has had ADHD her whole life, but was diagnosed in 2007. (Sales Dep 181:13-17) Focusing is affected by her disability. (Sales Dep 233:22-24) It impairs her speaking. She

draws a blank in her mind, in her processing. (Sales Dep 234:08-23) She was diagnosed with depression in 2009. (Sales Dep 296:10-11) Her depression developed during the harassment at inVentiv. (Sales Dep 296:16-20) She was first diagnosed with anxiety in January of 2011. (Sales Dep 296:07-09) Her anxiety developed during the harassment. (Sales Dep 296:21-25) Depression sometimes impairs her sleeping. Either she has trouble sleeping, or she sleeps too much. (Sales Dep 235:04-10)

The relationship between IMPAX and inVentiv is that IMPAX is the manufacturing. inVentiv supplied a sales force, called specialty sales reps, to sell IMPAX's product. (Shafranski Dep 09:04-12) In 2010 and 2011, inVentiv supplied 66 specialty sales reps to IMPAX. (Shafranski Dep 09:13-16) Sales' employer was inVentiv; they directed and controlled her activities on a day-to-day basis. (Sales Dep 55:03-04; 11-13) The majority of her time spent calling on doctors was by herself; she was working alone 95% of her time. (Sales Dep 93:24-94:05)

Sales had no other jobs while employed at inVentiv. (Sales Dep 73:14-16) She got her real estate license in maybe 2010. (Sales Dep 74:09-12) She had business cards, which Sales ordered and paid for. (Sales Dep 75:22-76:07) She has never represented a client in a real estate transaction; she never made any money as a real estate agent. (Sales Dep 76:23-25; 78:09-11) She never gave anyone at inVentiv one of her cards. (Sales Dep 79:06-10) She never gave anyone at IMPAX one of her cards. (Sales Dep 79:16-18) She never gave any of her customers, while she was at inVentiv, any of her cards. (Sales Dep 79:11-13)

Graham Partington, a Regional Training Manager ("RTM"), was her first supervisor at inVentiv. (Sales Dep 65:16-22) Renee Pauley replaced him after he was promoted. (Sales Dep 66:17-18) Partington, Pauley, and Sharon O'Sullivan all were RTMs and employees of

inVentiv.  (Sales Dep 66:07-14)  Pauley and O'Sullivan were Sales' direct supervisors from

Inventiv.  (Sales Dep 60:14-18)  Amy Hyde was her manager from IMPAX.  (Sales Dep 60:10-

13)  Hyde was a Regional Business Manager ("RBM").

Scott Miller is Director of Commercial Compliance.  (Miller Dep 06:15-19)  He trains

their field forces as to the specific business rules for each client, then monitors and audits those

aspects as the contract progresses.  (Miller Dep 06:23-07:04)  He does not have any role in

investigating a sales rep's job performance (Miller Dep 08:07-10), but if a sales rep has violated

an inVentiv compliance policy, he participates in that investigation.   (Miller Dep 08:11-14)

Conflict of interest would fall under compliance (Miller Dep 08:15-17), and would include

whether people are employed at another agency at the same time they're employed with

inVentiv.   (Miller Dep 08:18-23)  They have had reps get employment at inVentiv while still

employed somewhere else in the pharmaceutical industry, without telling inVentiv.   (Miller Dep

09:02-05) Note that Miller did not mention "real estate" as being a conflict of interest.  He has

concentrated on pharmaceuticals.  Another example of conflict of interest could be where

somebody misrepresents themselves or does something other than what they should be doing on

their behalf, within an office.   (Miller Dep 09:09-18)  He has confronted maybe four or five

employees that he felt were misrepresenting themselves.   (Miller Dep 10:01-08)  Sales is the

only other circumstance where he's investigated an employee for misrepresentation.  (Miller Dep

15:12-16)  It is his understanding from HR that all of the individuals he investigated for

misrepresentation were terminated.  (Miller Dep 15:19-25)  He is intentionally slanting his

testimony here.  He determined Sales was not misrepresenting herself.  Yet the inference here

pools Sales as if she were one of the misrepresentation terminations.  He is comparing apples to

oranges.

Based on Miller's investigation of this realtor card incident, **he did not think Sales was misrepresenting herself as other than an IMPAX rep.** (Miller Dep 23:03-11) The issue was the conflict of interest with her being an IMPAX rep and also doing business or trying to induce business with the card as well, at the same time. (Miller Dep 23:11-15) He thinks she was there for that purpose as well. (Miller Dep 23:16-18) But nowhere in any of the documentation does it quote anyone saying she was there to induce real estate business. Ultimately, Sales was fired because of what Miller "thought," with no factual basis for that thinking. Further, Miller testified: "Another example of conflict of interest could be where somebody is misrepresenting themselves or doing something other than what they should be doing on their behalf, within an office. (Miller Dep 09:09-18)" This is more inVentiv management doublespeak. Miller testified that she did not misrepresent herself; rather, the issue was conflict of interest. Clearly implying that the two are separate offenses. Harrison testified that if there was knowledge of other sales reps' dropping off blank Business Reply Cards ("BRCs") at physicians' offices, that would have been important for her to know in deciding whether Sales should be terminated. (Harrison Dep 28:15-21) It would be important for consistency in possible resolution. As an HR professional, application and consistency are important. (Harrison Dep 28:23-29:03) And if inVentiv management had documented any of Sales' complaints/discussions, then Harrison would have known, and Sales would not have been fired. Unless they were truly just wanting to be rid of her.

Sales was terminated because of the double offense of conflict of interest and leaving BRCs. Harrison testified that the BRC issue, in and of itself, would not have been grounds for termination. But together with the real estate conflict of interest, it made it a (combined and) immediately terminable offense. And with absolutely no foundation, Miller testified that it was

his understanding that Sales gave the realtor card to the individual at the doctor's office to solicit real estate business.  (Miller Dep 23:20-23)  This is nowhere in the record.  Miller apparently opted to edit the facts.  Miller's own report states:  "Connie said that Yolanda gave her a realtor's business card stating that she did not have any IMPAX business cards at the time." (Bates No. INV-0000171)

O'Sullivan conducted her performance reviews.  (Sales Dep 56:09-14)  Hyde suggested she speak more in meetings, and O'Sullivan and Hyde would provide coaching about her ability to focus.  (Sales Dep 62:07-12)  Neither O'Sullivan nor Hyde ever put Sales on a performance improvement plan; led her to believe her job was in jeopardy as a result of her performance, or put her on any sort of corrective action plan.  (Sales Dep 56:21-57:02; 62:01-06)

Sales reps provide BRCs to the doctors.  (Sales Dep 94:13-14).  In order for a physician to receive samples of any product, the doctor has to sign for the sample in front of the rep.  (Sales Dep 99:18-20)  The doctor signs the BRC and the rep mails it in.  (Sales Dep 98:19-25)   In BRC program training, the first rule is that the rep "must observe practitioner's signature for BRCs." (Sales Dep 101:12-14)  It is a violation of policy to leave unsigned BRCs; the reps must be in the presence of the doctor when they sign the BRC.  (Sales Dep 16:19-24)

During a presentation in January of 2011 (Sales Dep 118:14-15), the Director of Sales for Pfizer (his name was Charlie [Sales Dep 117:04]) said, "It appears BRCs are being left behind." (Sales Dep 116:21-23)  Sales' team members were there:  Vickie Hauser ("Hauser"), Paula Wilkinson ("Wilkinson"), Kesha Baham ("Baham"), Ruel Marten ("Marten"), and Robert Ruth. (Sales Dep 119:01-14)

Based on the policy communicated to Sales, it was not her understanding that she could be terminated for leaving unsigned BRCs.  (Sales Dep 113:06-09)  To her knowledge, several

5

inVentiv reps leaving BRCs at doctors' offices were not terminated. (Sales Dep 104:02-04) Jeff Humphrey ("Humphrey"), who worked for Pfizer (Sales Dep 106:14-17), is the first rep doing so that a physician actually discussed with Sales. (Sales Dep 104:06-09) Staff from various offices, including Baptist Hospital, Southern Hills Hospital, and Columbia Medical Center, told Sales that Humphrey had left BRCs. (Sales Dep 104:16-21) Humphrey promoted Lyrica before Sales did. (Sales Dep 106:14-17) And when Sales went into the office to promote it and have the BRC signed, they would tell her, "It's okay to leave it and the physician will sign it because other reps are doing it." (Sales Dep 105:06-11) When Humphrey's tactics affected Sales' business, she told her managers (Hyde and O'Sullivan) at the beginning of her time promoting Lyrica. (Sales Dep 105:17-24) They told her to perform her duties as she's supposed to, that they couldn't control those reps. They basically told her to stay focused on her job. (Sales Dep 106:10-13) She does not know if O'Sullivan or Hyde contacted Pfizer about Humphrey. (Sales Dep 106:22-24) Humphrey did not stop leaving unsigned BRCs at those locations; she was told that by staff members (Sales Dep 108:02-08) who did not discuss whether they told Pfizer he was doing that. (Sales Dep 109:07-11) They weren't "telling" on him; they were saying, "We're busy in our office today. You can go ahead and leave that. We'll get it signed. We do need your product." (Sales Dep 109:13-17) She told them she couldn't; that was her opportunity to be with the doctor. It affected her money. (Sales Dep 109:18-20)

As a manager of HR at inVentiv, Harrison was involved to a degree with the decision to terminate sales reps. (Harrison Dep 20:08-11) If it were projects she was responsible for, she was to provide the allegations, investigate, provide her findings of the investigation, and recommend a resolution for the issue. (Harrison Dep 20:13-17:20) IMPAX was one of her projects. (Harrison Dep 20:20) She does not recall her initial thought when she was first told

that Sales had left a realtor card at a physician's office. (Harrison Dep 21:06-10) She does not recall if any of her initial thoughts were that this was a violation that warranted immediate termination. (Harrison Dep 21:11-14)

Sales was ultimately terminated from inVentiv Health. Prior to that particular issue, Harrison had no knowledge of who Sales was at all (Harrison Dep 17:18-21; 18:03-10); she testified she never met Sales in person. (Harrison Dep 31:18-19) Harrison claims she had telephone conversations with Sales, but does not recall how many. (Harrison Dep 31:20-24) And she admitted that her **first** conversation with Sales was to inquire on the allegations that had been brought forth. (Harrison Dep 32:03-05) She does not recall the nature of the subsequent conversations she had with Sales. (Harrison Dep 32:06-08) That first phone conversation involved Harrison, Sales, Miller, and Shafranski. (Harrison Dep 32:09-13) Harrison alleges she did not learn about ADHD or dyslexia or problems Sales was having in the performance of her job duties prior to her termination. (Harrison Dep 17:22-18:02) Harrison testified that the issue that ultimately led to Sales' termination had to do with a compliance violation and improper representation. (Harrison Dep 18:10-15) And as is presented herein (and testified to, by inVentiv management), there is no inVentiv policy that states the BRC issue is a terminable offense. Further, as Miller himself testified, he determined that Sales did not misrepresent herself. There was no documented inVentiv basis for Sales' termination.

The compliance violation was on the IMPAX project. Sales reps were to have BRCs signed as part of a compliance program. Harrison recalls that, through various discussions with office staff in a couple of Sales' physicians' offices, Sales was not following protocol established for BRCs. (Harrison Dep 18:16-23) She vaguely recalls that the violation of protocol was that Sales was leaving BRCs in the physician's office and asking office staff to have them signed.

She would leave the office and then return to pick them up. (Harrison Dep 18:24-19:07) She had never run across that issue with other sales reps, nor had she run across that issue after Sales' termination and prior to Harrison leaving inVentiv. (Harrison Dep 19:08-14) She first became aware of the issue through the Compliance Department. (Harrison Dep 19:15-16)

Shafranski believes it was Miller who said if it was a commingling related to the realtor card and her job with inVentiv representing IMPAX, that could lead to termination based on the experiences they've had. (Shafranski Dep 61:23-62:05) The same could be said for the BRCs. If that could be verified that she had left blank stacks, that was a policy violation and could lead to termination. (Shafranski Dep 62:06-09) When Miller explained the allegations about the BRCs and real estate card, as Harrison recalled, he did not mention anything about it being an immediately terminable offense. (Harrison Dep 21:15-22) As the HR Manager of the IMPAX project, after Harrison conducted the investigation, she did feel that those violations warranted not putting Sales through some type of progressive disciplinary process, but just immediately terminating her. (Harrison Dep 21:24-22:12)

inVentiv management (Harrison and Miller) alleges that several physicians' offices confirmed the infraction: the BRCs happened three times. (Harrison Dep 22:15-23:01) This is not irrefutable proof. This is not proof at all. This is hearsay. And the individuals who claim to present this as fact, cannot even remember to whom they spoke; when they spoke; or if they provided that (hearsay) information to Sales. They made no attempt to disguise their investigation as impartial or comprehensive.

Harrison testified the real estate card infraction occurred one time. (Harrison Dep 23:02-05) There is no written policy that said that the BRC incident or leaving them at the physician's office for the physician's signature was an immediately terminable offense. (Harrison Dep

23:06-10)  It was this time, because all infractions are reviewed based upon the nature of the

issue.  (Harrison Dep23:11-17)  Harrison personally talked to these physicians' offices about

whether Sales actually left the BRCs.  (Harrison Dep 25:02-05)  She spoke only with office staff;

not with any physicians.  She does not recall at which physicians' offices she actually spoke to

staff members.  (Harrison Dep 25:11-13)  She does not recall if she spoke to anyone in Dr.

Strickland's office, Dr. Kaminsky's office, or Dr. Lee's office.  (Harrison Dep 25:14-23)  She

does not recall what she asked of these individuals in the physicians' offices to ensure that it was

Sales that dropped off the BRCs. (Harrison Dep 25:24-26:03)  Harrison told Sales that she

performed the investigation, but did not speak to a physician or healthcare provider.  (Sales Dep

274:18-21)  Harrison didn't lie to Sales; she admitted her wrongdoing.  She fired her for

something that was not investigated; something Sales did not do.  Sales complained about

discrimination on February 9, 2011; Harrison decided on February 13th that Sales would be fired;

and Sales was told on the 14th.  (Sales Dep 275:06-13)  Harrison did not investigate, because she

didn't ask the healthcare providers if it were true.  She told Sales she was done with the subject

and if Sales did not return the company equipment, she would be arrested.  (Sales Dep 257:22-

276:01)  A healthcare provider is defined in their policies and procedures.  (Sales Dep 276:05-

06)  A receptionist is not a healthcare provider.  (Sales Dep 276:10-11)  A healthcare provider

would be the physician, someone who can write the scripts.  (Sales Dep 276:17-19)  A doctor is

the healthcare provider.  That's considered the customer, not the receptionist.  (Sales Dep

277:23-25)  Harrison alleges that due diligence was done to investigate the allegation, and it was

confirmed that this was a compliance infraction.  Therefore, the decision was made to terminate

employment. (Harrison Dep 23:22-24:02)  "Due diligence" is a misnomer.  Their "investigation"

was slipshod, incomplete, and fraught with inaccurate, often contradictory statements and replete

with personal assumptions having little, if any, basis in fact. Harrison does not recall asking any other sales reps if they had been engaging in the same conduct. (Harrison Dep 29:04-06) She does not recall looking back to determine whether other sales reps had been disciplined for leaving blank BRCs. (Harrison Dep 29:07-10) She does not have a database, as an HR manager, that she could look back at, showing sales reps, their alleged infractions, and how they were ultimately disciplined or terminated for those infractions, to ensure consistency. (Harrison Dep 29:11-16) One might infer that Harrison is saying that if others had been disciplined, Sales might not have been fired? Their farce of an investigation left every stone unturned. Much of the decisionmaking was based on personal inference and innuendo, particularly by Miller. They took the word of Humphrey, whom Sales alleged was disgruntled because she was given Lyrica to promote in his territory. They took the (phone) word of physicians' office staff with regard to Sales. They did not interview Humphrey. They did not speak with physicians, only their staffs. And they did not allow Sales to present her side. O'Sullivan does not remember what options were discussed in that meeting with Sales as to how to correct her conduct relating to the BRC issues. (O'Sullivan Dep 28:23-29:01) If Sales had been offered options other than termination, she would not have recorded that somewhere; would not have filled out a coaching report. (O'Sullivan Dep 29:02-07) There is no other type of document she would have filled out evidencing what options were given to Sales to correct her conduct as it relates to the BRC issue. (O'Sullivan Dep 29:08-12) However, clearly, inVentiv gave Sales NO options other than termination. And once again, no documentation in a file about ANY of this.

When these allegations against Sales about the BRC came to light, O'Sullivan was not

told of any other sales reps who might have done the same thing. (O'Sullivan Dep 30:12-16) This is contrary to what Sales testified to, numerous times. Sales said repeatedly that she told Hyde and O'Sullivan about Humphrey, when it affected her business.

It was O'Sullivan's understanding that, with regard to the realtor card Sales was alleged to have left at a physician's office, that Sales had left her business card with physicians. (O'Sullivan Dep 30:22-31:01) She doesn't know if she knew at that time whether that was a policy violation. (O'Sullivan Dep 31:05-07) Perhaps it is because it was <u>not</u> a policy violation.

O'Sullivan testified that as part of her job responsibilities as an RSTM, she was required to be familiar with the policies and procedures that govern sales reps' conduct in the performance of their job duties. (O'Sullivan Dep 31:08-13) Clearly, O'Sullivan was not familiar with the policies and procedures: a poor figurehead, at best.

O'Sullivan had heard the word "commingling." (O'Sullivan Dep 31:14-15) She does not remember a specific inVentiv policy about sales reps having a second job, but knows it is not acceptable. (O'Sullivan Dep 31:25-32:03) She does not know if it is not acceptable under any circumstance. (O'Sullivan Dep 32:04-05) Yet another instance of O'Sullivan being unfamiliar with the policies. She testified earlier that part of her job as an RSTM would be to address sales reps when issues about performance of their duties were brought to her attention, to coach them or correct them so they don't do that again. When questioned about that, she testified, "Yes, in some cases." (O'Sullivan Dep 33:23-34:04) She was asked to be an observer on this call and was unaware of the allegations until being on the call. (O'Sullivan Dep 34:10-12) If the issue had been brought to her about any sales rep, it was not her decision to coach without seeking guidance of having input from HR. (O'Sullivan Dep 34:17-21) Again, one would question her value in that position as anything but a figurehead. More importantly, what is it that made

O'Sullivan more qualified to do nothing, than Sales would/could have been? What exactly was her position and her duties? To simply be a conduit for questions, to HR? And she did testify earlier that a part of her job was to counsel in situations like this. Her testimony fluctuated with each question.

Harrison recalls Sales worked as an inVentiv employee on the IMPAX project. (Harrison Dep 16:14-20) Harrison had very little day-to-day interaction with Sales to observe how she performed her job duties and responsibilities. (Harrison Dep 16:21-24) This is a straightforward example of inVentiv management's doublespeak. Harrison admitted she did not know Sales; had never met her before the issue at hand. That being the case, she could not possibly have had "very little day-to-day interaction" with Sales to observe her performance: never had **any** interaction with Sales. Harrison's only involvement with Sales was to railroad and accelerate her termination.

Ciampa, Shafranski, Harrison, and Miller had a roundtable discussion about Sales and the BRCs. (Shafranski Dep 61:10-18). Shafranski does not recall options other than termination, even if Miller was able to confirm it with the physicians' offices. (Shafranski Dep 62:15-19) No one else in that roundtable discussion seems able to recall options being discussed. Shafranski testified that Miller had shared that there were other reps that commingled positions: held two positions; worked for two pharmaceutical companies. And that led to termination. (Shafranski Dep 63:05-11). There could be conflict of interest as far as the competing products they're promoting. Compliance issues related to that as well: conflict of interest representing two different organizations from the same person. (Shafranski Dep 64:04-09) Compliance issues could be: You have two similar, competing products and you're trying to position one in a more favorable light when, in fact, they could be the same product or very similar. (Shafranski

Dep 64:11-15). This is a ludicrous anomaly. Was Sales fired because she said, "Buy this house from me; don't buy the medicine that could save your life?" Lyrica and real estate are not even remotely similar products. Once again, Miller is coloring the discussion with his own prejudice about the situation. Sales did not commingle; she was not trying to drum up real estate business. And it was not a conflict of interest, as defined by Miller. Yet he continues to interject "termination" into all of the joint conversations about Sales, and apparently his subliminal suggestions worked.

Harrison indicates that as part of her investigation, she talked to Sales. (Harrison Dep 24:19-21) She does not recall whether she, Miller, and Shafranski had an in-person or telephone meeting prior to calling Sales or having Sales on that phone conversation. (Harrison Dep 32:14-18) In that phone conversation, there was no mention that Sales was going to be subject to termination. (Harrison Dep 32:19-22) She does not recall if there was any discussion that what had been alleged was a terminable offense. (Harrison Dep 32:23-33:01) She does not recall the first time she was aware that termination of Sales was being discussed or considered. (Harrison Dep 33:15-18) She does not recall if someone at inVentiv came to her and communicated to her that they felt Sales should be terminated. (Harrison Dep 33:19-22) This is doublespeak, once again. It was Miller's recommendation that they terminate Sales' employment; it was his investigation report that was forwarded to Harrison.

Harrison testified that Sales at no time admitted to Harrison that she had left the BRC. (Harrison Dep 33:24-34:01) She is not aware if Sales ever admitted to anybody she had done it. (Harrison Dep 34:02-04) Harrison does not recall if, when she and Miller spoke to the staff members at the physicians' offices and got that information, she ever sat down and communicated that to Sales about who they had talked to and what they had said. (Harrison Dep

13

34:05-10) Sales denied the BRC incident. (Harrison Dep 24:23-25:01). Sales testified that she has no idea where she would physically leave a BRC without getting a physician's signature, because she would not do that. (Sales Dep 172:16-19) This is a prime example of inVentiv's "due diligence." Sales was "talked to" on the February 9 conference call. Sales denied their allegations. And that was the extent of their investigation with regard to the employee herself. They chose to ignore what Sales said, and opted to "believe" (with no basis in fact) the statements of various, behind-the-scenes, unnamed "office staff" whose actual input was apparently so inconsequential, generic, and/or jaded that inVentiv chose to not only not depose them, but not provide any affidavit or documentation whatsoever as to their testimony. No doctors were interviewed; Sales was not allowed any opportunity to confront her accusers; Sales was never even informed of the accusations or the accusers.

 To Shafranksi's knowledge, Sales had never been warned in the past about leaving BRCs at medical providers' offices. (Shafranski Dep 58:17-20) Harrison does know that Miller talked to these physicians' offices. (Harrison Dep 26:04-06) Both of them spoke to staff members in these physicians' offices about the BRCs. (Harrison Dep 26:09-12) inVentiv claims that the individuals in the physicians' offices they spoke to, did reference Sales specifically by name as the person that left the BRCs. (Harrison Dep 27:01-05) Harrison is unaware of how many BRCs were left by Sales at these physicians' offices. (Harrison Dep 27:10-12) Harrison is not aware of any other sales reps dropping off BRCs at physicians' offices. (Harrison Dep 27:13-19) But she <u>did</u> become aware on February 9, 2011, because Sales told her during the conference call. And Harrison did nothing about it.

 Miller testified that HR would keep track of reps who've been terminated and the

reasons therefor. (Miller Dep 33:14-22) Harrison would have been the HR manager in this instance that would have had that file. (Miller Dep 33:19-22) However, Miller is incorrect in this. Harrison testified that she does not have a database, as an HR manager, that she could look back at, showing sales reps, their alleged infractions, and how they were ultimately disciplined or terminated for those infractions, to ensure consistency. (Harrison Dep 29:11-16) inVentiv management knows not what its counterparts do.

Miller testified he does from 30 to 60 investigations per year of inVentiv employees, including sales reps, for policy violations or misconduct. (Miller Dep 24:09-14) An inVentiv policy of conflict of interest was what he was using as part of his investigation to define the term "misrepresentation." (Miller Dep 26:07-13) Miller doublespeaks again. He clearly previously testified that conflict of interest was a distinct and separate entity from misrepresentation. Here, he himself is commingling the terms. Miller alleges that information came back that Sales was dropping off BRCs at the offices and not witnessing signatures from the healthcare professionals, nor was she taking those and mailing them as she was instructed to do by the business rules for the company. (Miller Dep 27:02-07) He does not know how many BRCs were signed by anyone without her witnessing it, and sent in. (Miller Dep 27:08-11) If Miller and Harrison had conducted a proper investigation, they might have amassed that rather critical information. Miller does not believe he ever investigated any other inVentiv employee who it had been alleged had left BRCs at offices without witnessing a signature. (Miller Dep 28:06-09) If inVentiv management had made notations in Sales' file when she informed them that others were leaving cards, he would have had others to investigate. Further, if the issue of BRCs was so critical, why wasn't there a space for the rep and the doctor to sign, at the same time? Further still, Miller alleges that Sales was not mailing the cards, at any point. But Harrison testified that

Sales was leaving the cards and then coming back to get and mail them.  If they were properly

gathering and evaluating all of the facts, how could they not have noticed all of these

discrepancies and contradictions in their revelations?  Miller is not sure of how many BRCs

Sales allegedly left.  They received information that there were several.  (Miller Dep 27:15-17)

Nor was Harrison sure how many cards were involved.  Apparently, Miller picked and chose

what information he would include in his report.  Further, they received reports, but didn't verify

any of them?

Miller's understanding of the allegations against Sales leading to her termination was that

they had received information that she was dropping a real estate card to a doctor's office for her

real estate business while she was making a promotional call on their behalf.  (Miller Dep 20:15-

23)  To verify that information, he was supplied with the business card from the office.

Allegedly, the doctor's office was the one that made the complaint, sending the document via a

rep from the field, a counterpart of Sales that also called on that office.  He does not recall the

rep's name.  (Miller Dep 21:01-12)  The rep, coincidentally, just happened to be Humphrey:  the

Pfizer rep who also promoted Lyrica to those same physicians, and also had BRCs of his own

that he left for the physicians to sign.

Based on Miller's investigation of this realtor card incident, he **did not** think Sales was

misrepresenting herself as other than an IMPAX rep.  (Miller Dep 23:03-11)  The issue was the

conflict of interest with her being an IMPAX rep and also doing business or trying to induce

business with the card as well, at the same time.  (Miller Dep 23:11-15)  He thinks she was there

for that purpose as well.  (Miller Dep 23:16-18)  It was his understanding that she gave the

realtor card to the individual at the doctor's office to solicit real estate business.  (Miller Dep

23:20-23)  Miller's report states:  "Connie said that Yolanda gave her a realtor's business card

stating that she did not have any IMPAX business cards at the time." (Bates No. INV-0000171) He believes that information about BRCs also came from her counterpart. (Miller Dep 27:24-28:01) He can't recall if it was the same rep that told them about the realtor card, without his report. (Miller Dep28:02-05) And actually, it was from that same rep: Humphrey.

Sales verbally applied for the senior sales rep position. (Sales Dep 125:05-07) The position was not posted; they were all word-of-mouth. (Sales Dep 125:17-20) She received the promotion in July of 2009. (Sales Dep 125:21-25) She applied for the recruiter and sales trainer position, verbally, in 2009, after her promotion. (Sales Dep 132:22-10; 133:14-16) Pauley was her supervisor at the time; Sales talked to her about the recruiter position. (Sales Dep 133:20-21-134:01) Pauley directed her to Hyde; she told Hyde she was interested in that position. (Sales Dep 134:09-10) O'Sullivan applied for the same position. (Sales Dep 134:14-19) O'Sullivan ended up receiving the Regional Sales and Training Manager ("RSTM") position, and that's when she became Sales' supervisor. (Sales Dep 134:24-135:01) O'Sullivan started with inVentiv at the same time as Sales. (Sales Dep 135:02-03) From what Sales knew of her work history, she felt they were equally qualified. They had the largest territories; their numbers were consistent. (Sales Dep 135:22-136:01)

Sales did nothing else to apply for the position for Regional Sales and Training Manager ("RTSM") other than telling Pauley and Hyde that she was interested in it, just as she had done in the past for positions. (Sales Dep 132:22-10; 133:14-16; 136:18-24) By the time the internal request form would have been posted, she had already rescinded her request to interview for the position. (Sales Dep 137:25-138:04) She was discouraged from it; was told she was not a candidate that inVentiv would like to see a new hire work with. (Sales Dep 138:07-09) They said they didn't want to see a new hire in the field with someone like her. (Sales Dep 142:15-16)

It was because of the way she verbalizes things, because of her focus.  (Sales Dep 143:07-08)

Pauley and Hyde told her she was not a good candidate; said it was coming from upper

management.  They suggested she take additional courses to make herself a better candidate.

(Sales Dep 138:16-19)  They expressly prohibited her from filling out an application; told her,

"Don't fill it out."  (Sales Dep 139:18-22)  She didn't understand at that time that she was being

discriminated against.  (Sales Dep 141:01-02)

inVentiv discriminated against Sales because of the ADHD with the RSTM promotion

process, her termination, and retaliation.  They put her in a hostile situation while role playing

with a rep.  They would change her sales call at the last minute, when she was getting ready to

call on a physician.  They would do things to try to confuse her.  They would ask her questions to

see if she changed her answer and how well she knew her product.  That was O'Sullivan.  (Sales

Dep 182:06-20)  Furthermore, Wilkinson (a co-worker) told her how easy her ride-alongs were.

They would go get their nails done.  (Sales Dep 190:04-06)  Sales talked to all of her teammates,

and confirmed that management never asked them questions to determine how well they knew

the product.  (Sales Dep 190:13-18)  Sales talked to another rep in management about different

management styles to try to figure out if everyone was being treated that way.  (Sales Dep

191:04-08)  She started speaking with Kim Wilson ("Wilson"), who took it in a negative manner.

Wilson said she was being confrontational by asking too many questions.   (Sales Dep 191:10-

13)  Wilson is an RBM; same position as Hyde, just a different territory.  (Sales Dep 191:14-20)

She did speak to Hyde about O'Sullivan and Wilson.  (Sales Dep 198:05-06)  Sales did

not complain to any other member of management that she felt her managers were asking her

questions just to test how well she knew the product, because she didn't feel she had another

member of management that she could complain to.  (Sales Dep 191:21-192:01)  She

complained to Hyde and O'Sullivan that her sales calls were being changed at the last minute and Hyde blew it off. (Sales Dep 192:14-19)

O'Sullivan testified that no one ever communicated to her that Sales had ADHD or depression. (O'Sullivan Dep 35:07-09, 14-16) Sales testified she told O'Sullivan she was taking medication for ADHD, but never said the type. She told O'Sullivan about the medication for depression, also. (Sales Dep 214:11-20) Sales did inform Hyde she was taking medication for ADHD. (Sales Dep 214:04-10) She never informed any member of inVentiv management about the fact she suffered from anxiety because she didn't have the opportunity to. She was diagnosed with anxiety a couple of weeks before she was terminated. (Sales Dep 208:22-209:02)

Hauser was an employee who violated the BRC policy but wasn't terminated—as well as Nicole from New Orleans. (Sales Dep 283:07-14) Hauser quite frequently bragged about leaving BRCs behind and discussed it openly. (Sales Dep 153:24; 156:25-157:17) Nicole talked about it, same as Hauser. (Sales Dep 175:15-19) Sales testified that if she knew, she assumed management knew. (Sales Dep 175:22-25) There were others that Charlie, the Director of Sales for Lyrica, had discussed in a meeting, but it was in general. (Sales Dep 283:19-22) Sales told Harrison, a member of management, that Hauser was leaving unsigned BRCs. (Sales Dep 170:03-06) Sales tried to explain that she had been discriminated against and the actions against her were not fair. Instead of her holding that conversation, Harrison said they've already made the decision. (Sales Dep 170:22-171:04) Said she was terminated. They didn't want to discuss the situation any longer. They wanted the company equipment or she would be arrested. (Sales Dep 163:10-23)

There were several embarrassing situations. (Sales Dep 183:07-09) The role-playing

instance was at an annual sales training meeting. (Sales Dep 183:23) It was in a conference room with all the sales reps. (Sales Dep 184:01-02) Baham was the sales rep who was the acting physician. (Sales Dep 185:01-03) Some of the negative or disparaging retaliatory remarks made to her were: "You can't read; there is no way that you can be performing like that by yourself; you have to be getting help from someone." (Sales Dep 269:19-270:05) Other sales reps were not engaging in the same role-playing exercise with management. (Sales Dep 186:09-11)

Baham and the South Carolina rep—she can't remember his name—were witnesses to inVentiv management's comments about her disability. (Sales Dep 217:23-218:04) Baham witnessed the conversation with O'Sullivan degrading Sales during the exercise. (Sales Dep 218:14-18) Hyde would talk about Sales' sales calls to other co-workers. (Sales Dep 195:21-25) Pauley and Partington were also talking about her sales calls. (Sales Dep 196:01-08) She doesn't know if they used the word "ADHD," but they talked about her focusing; about the symptoms. (Sales Dep 196:12-14) (Sales Dep 196:19-21) The co-workers who heard these managers talk about her disability were Wilkinson, Hauser, and Michele O'Leary ("O'Leary"). (Sales Dep 198:19-25) She knows that managers told co-workers about her disability, because co-workers would tell her. The three she mentioned would let it be known that they were talking about it. (Sales Dep 199:20-200:03) In her annual reports, semi-annual reports, and field-coaching reports, management does not use the word "ADHD," but they do refer to her disability. (Sales Dep 203:01-08) It is her impression that based on the language in the coaching reports, management knows she has ADHD. (Sales Dep 203:20-23)

Sales informed O'Sullivan that she suffered from ADHD. (Sales Dep 204:24-205:03) She thinks she also informed Pauley and Partington (Sales Dep 205:05; 205:17) and Hyde, at

IMPAX.  (Sales Dep 206:01-02)  She informed O'Sullivan and Hyde that she suffered from depression, and discussed with them that she suffered from dyslexia.  (Sales Dep 206:07-10; 12-15; 209:03-12)  Sales had these conversations with management.  Whenever they were discussing her performance, she talked about her disabilities because her performance reviews were negatively impacted due to her disabilities.  From there, they would discuss them.  (Sales Dep 208:11-16)  She typically talked about her disability around the time her performance was being reviewed, or whenever she had a manager riding along with her.  (Sales Dep 208:170-21)  She discussed with O'Sullivan any limitation caused by her disability.  (Sales Dep 211:10-15)  She does not remember what she told her.   At the time she just explained the situation.  (Sales Dep211:18-21)  They talked about focus, which was in her coaching report.  Whenever she talked about it, it was at a point where they were coaching her. (Sales Dep211:22-212:01)  She talked about limitations caused by her disability, only to the management that would coach her.  That would be O'Sullivan and Hyde.  (Sales Dep 212:05-09)  She and Hyde talked about Sales' e-mails, her grammatical errors.  They talked about sharing her ideas with co-workers, speaking up in meetings.  (Sales Dep 212:10-13)

Sales complained to inVentiv or IMPAX management, whenever a situation occurred, that she felt she was being discriminated against because of her disability:  the promotion to RSTM, the harassment from O'Sullivan.  (Sales Dep 222:11-23)  She complained about the coaching reports, that she was harassed for her disabilities.  They were giving her negative ratings because of her disability.  (Sales Dep 229:17-24)  She complained to Hyde, O'Sullivan, Shafranski, and Harrison when she started noticing the discrimination and realizing the way she was being treated.  She had never received a negative coaching report until inVentiv was, in her opinion, planning to fire her.  She feels like they were just preparing to fire her.  (Sales Dep

223:15-25) She felt the coaching reports were unfair. (Sales Dep 224:14-16) The coaching reports basically just described her disability. She felt that was inVentiv's way of saying they were aware she had this disability. From there, her goal was to have the situation modified. She asked them for accommodations. (Sales Dep 224:22-225:02)

Sales complained to O'Sullivan in the fourth quarter of 2010, around November. (Sales Dep 226:04-07) She elevated that complaint on February 9, 2011, to Harrison and Shafranski. (Sales Dep 226:16-21) She complained to Hyde that she didn't get the RSTM position because of her disability. (Sales Dep 227:02-06) She complained about disability discrimination to Shafranski, O'Sullivan, and Harrison at inVentiv. (Sales Dep 221:15-21) She did all of that on the conference call in February of 2011, a couple of days before she was fired. (Sales Dep 221:23-222:03)

Hauser was someone that would sit up and freely talk about leaving her BRCs behind, and it was ignored by management. She was actually promoted after Sales left. (Sales Dep 241:10-21) Ruth, a Caucasian male, was a specialty sales rep; she doesn't think he had a senior promotion. (Sales Dep 242:09-14) His performance dropped and he was put on a coaching plan. He told them it was because of his ADHD and he was allowed to keep his position. (Sales Dep 242:22-24) O'Leary was a specialty sales rep, whose territory struggled from the time she entered. She was a rep that was constantly on the bottom of the list. She was allowed to stay there for years without any recommendation of losing her job. After Sales complained about that, O'Leary eventually had the opportunity to transfer to another position with IMPAX. She was not terminated. (Sales Dep 243:12-24) O'Leary did commit a serious policy violation; she would access management's computer. (Sales Dep 246:12-17)

Sales applied for tuition reimbursement three times (Sales Dep 260:23-262:03): the first time, around July of 2009. (Sales Dep 261:18-19) It was declined because she didn't list the full description of the classes. She did it again, listed all the descriptions, never got a response. That was still part of the first application. (Sales Dep 262:15-23) She never got a response from management. She e-mailed management; thinks it was Pauley. (Sales Dep 253:21-25) Applied for tuition reimbursement the second time closer to January of 2010, because she missed enrollment for the first term. (Sales Dep 264:14-21) She applied the third time in February of 2011. (Sales Dep 265:06-08) The tuition fee she sought to be reimbursed was around $3K each time. (Sales Dep 265:01-03)

inVentiv retaliated against her, because after she complained of discrimination, she was immediately fired. (Sales Dep 267:02-05) She complained of discrimination during the conference call on Thursday, February 9, 2011. (Sales Dep 267:06-09) Her firing involved false allegations that were not investigated properly. No one would listen to her when she tried to explain herself of what happened. They fired her and threatened to have her arrested. (Sales Dep 269:05-09)

The reason she was given for her termination was leaving BRCs behind and promoting real estate during company time. (Sales Dep 271:25-272:03) She was not interviewed by management about those accusations. (Sales Dep 272:04-06) Management never asked her or confronted her about unsigned BRCs or promoting real estate business on company time. (Sales Dep 272:09-16) inVentiv did not ask her; they accused. (Sales Dep 272:23-24) Miller interviewed her about those things on February 9, 2011, over the phone. (Sales Dep 273:17-23) There are no written statements indicating or memorializing what the two of them discussed during that call. (Sales Dep 273:24-274:02) O'Sullivan also asked her about those two things.

(Sales Dep 274:03-08)  Neither O'Sullivan nor Miller told her that inVentiv had investigated

those allegations.  They said they were going to.  (Sales Dep 274:09-15)  When O'Sullivan was

at inVentiv in the RSTM role, she did not keep any type of record that would show when sales

reps had been accused or it had been alleged they dropped off blank BRCs at physicians' offices

or healthcare providers and what type of action was taken with that rep.  (O'Sullivan Dep 29:24-

30:11)


## II.  STANDARD OF REVIEW

Defendant as moving party has the initial burden of showing the Court, by reference to

the record, the basis for the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When

the non-moving party has the burden of proof at trial, the movant must carry the initial burden in

one of two ways: either by negating an essential element of the non-movant's case or by showing

that there is no evidence to support a fact necessary to the non-movant's case.  *See Clark v.

Coats & Clark, Inc.*, 929 F. 2d 604, 606-08 (11th Cir. 1991).  Bold, conclusory statements that

the Plaintiffs cannot meet their burden at trial are insufficient.  Only after the movants have met

their initial burden does the burden shift to the non-moving party to "demonstrate that there is

indeed a material issue of fact that precludes summary judgment."  929 F. 2d at 608.

Summary judgment is inappropriate unless the evidence is so one-sided that a reasonable

jury could arrive at only one conclusion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252

(1986).  "Credibility determinations, the weighing of evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of the judge."  *Id.* at 255.  Under F.R.C.P.

56, the Court's role is narrowly limited to assessing the threshold issue of whether a genuine

issue exists as to material facts requiring a trial.  *Id.* at 249.  Thus, the evidence of the non-

moving party will be believed as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor. *See Hunt v. Cromartie*, 526 U.S. 541, 550-555 (1999).

Reasonable inferences are inferences reasonably drawn from all facts then before the Court, after sifting through universe of all possible inferences the facts could support. Reasonable inferences are not necessarily more probably or likely than other inferences that might tilt in the moving party's favor. Instead, so long as more than one reasonable inference can be drawn, and that inference creates a genuine issue of material fact, the trier of fact is entitled to decide which inference to believe and summary judgment is not appropriate. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

Further, it is well established that questions concerning a person's state of mind (such as motive, knowledge, intent, good faith or bad faith, malice, fraud, conspiracy or consent) are rarely disposable at the summary judgment stage. *See Hutchinson v. Proxmire*, 443 U.S. 111 (1979). Based on this standard, it is clear that Defendant's Motion for Summary Judgment must be denied.

### III. LEGAL ARGUMENT

**A.    Defendant Has Failed to Meet Its Burden that It Is Entitled To Summary Judgment on Plaintiff's Disability Discrimination Claims**

Under the ADA "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation**,** job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The term "disability" means, (A) a physical or

mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1)(A)-(C). An individual may establish a disability under any one or more of these prongs. 29 CFR 1630.2(g)(2). The definition of disability "shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). Additionally, in amending the ADA, Congress stated: "If an individual establishes that he or she was subjected to an action prohibited by the ADA because of actual or perceived impairment -- whether the person actually has the impairment or whether the impairment constitutes a disability -- then the individual will qualify for protection under the Act." 154 Cong. Rec. at S8842. *See also* 29 C.F.R. §1630.2(j)(1)(iii) (the primary object in cases brought under the ADA should be whether employers have complied with their obligations and whether discrimination occurred, not whether an impairment limits a major life activity which should not demand extensive analysis).

The term "'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA requires the employee and employer to interact in good faith to determine the "precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C. F. R. § 1630.2(o)(3); *Lafata v. Church of Christ Home for the Aged,* 325 F. App'x 416, 422 (6th Cir. 2009). S*ee also Kleiber v. Honda of Am. Mfg., Inc.,*485 F.3d 862, 871 (6th Cir. 2007) ("the interactive process is mandatory, and both parties have a duty to participate in good faith."). Failure to engage in the interactive process can result in liability under the ADA if reasonable accommodations would have been possible. *Burress v. City of Franklin,* 2011 U.S. Dist. LEXIS

92668 *41 (M.D. Tenn. August 17, 2011) (ECF No. 37-1) (citing *Lafata,* 325 F. App'x at 422). Moreover, an employee is not required to use the "magic words" accommodation or disability to trigger the required interactive process, asking for continued employment can be sufficient. *Burress,* 2011 U.S. Dist. LEXIS 92668 *41-42. (*emphasis added*)

Essential functions are "fundamental job duties of the employment position . . . not including] the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). A job function may be essential where: (1) "the reason the position exists is to perform that function," (2) there are a "limited number of employees available among whom the performance of that job function can be distributed," (3) "[t]he function [is] highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function," or (4) for other reasons. 29 C.F.R. § 1630.2(n)(2)(i)-(iii). Essential functions are the critical job duties, while marginal functions are those tasks or assignments that are tangential.

The term substantially limits means "(i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."  29 C.F.R. §1630.2(j)(1)(i)-(ii). Major Life Activities mean "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. §1630.2(i). (*emphasis added*)

Plaintiff may prove her case by either direct or indirect evidence. Direct evidence includes "evidence that the employer relied upon the plaintiff's disability in making its employment decision."  *Monette,* 90 F.3d at 1185-86.  Likewise, claims for failure to

accommodate are analyzed under the direct evidence framework. *Kleiber,* 485 F.3d at 868-869. To prove a claim of discrimination under the ADA using direct evidence, a plaintiff must show that she: (1) is disabled; (2) is otherwise qualified to perform the requirements of her position despite her disability, (a) without accommodation, (b) with an essential job requirement eliminated, or (c) with a proposed reasonable accommodation; and (3) the employer bears the burden of proving that a challenged job criterion is essential and a business necessity or that a proposed accommodation will impose and undue hardship. *Monette,* 90 F.3d at 1186. Direct evidence does not require the fact finder to draw any inferences to reach that conclusion. *Amini v. Oberlin Coll.,* 440 F.3d 350, 359 (6th Cir. 2006). Direct evidence is sufficient to defeat a motion for summary judgment in employment discrimination cases. *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 511(2002). An employer's discriminatory statements may be direct evidence of discrimination or form the basis for an inference of discrimination and establish pretext. In *Ash v. Tyson,* 546 U.S. 454, 126 S.Ct. 1195 (2006), the Court held that a manager's use of the word "boy" when referring to African Americans was evidence of discriminatory animus in the selection process. *Id.* at 1197. In *Ross v. Campbell Soup, Co.*, 237 F.3d 701 (6th Cir. 2001), the Court held that statements made were sufficient to establish a genuine issue of pretext in a "regarded as" disability case.

In this case, Plaintiff has produced evidence that she did advise her management of her disabilities. She did advise management that she was taking prescription medications for her disabilities. And Plaintiff did request accommodation for her ADHD by way of her management allowing her additional time to prepare for presentations, and accommodation for her dyslexia by way of someone from management reading and editing her work e-mails before they would be

sent.  inVentiv management denied those requests for accommodation.  Amy Hyde, her manager at IMPAX, did agree to proofread her e-mails.  But IMPAX was not her employer; inVentiv was.

In 2008, Congress amended the ADA to broaden the coverage provided by the statute's definition of "disability."  ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008 ("ADAAA"); *see also Bailey v. Real Time Staffing Servs., Inc.*, No. 13-5221, 2013 WL 5811647, at *2 (6th Cir. Oct. 29, 2013) (unpubl.) (same).  To that end, Congress intended the amended ADA to "carry out the ADA's objectives of providing 'a clear and comprehensive national mandate for the elimination of discrimination' and 'clear, strong, consistent, enforceable standards addressing discrimination' by reinstating a broad scope of protection to be available under the ADA."  ADAAA, at § 2(a)(1).  In relevant part, Congress intended to "convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Id.* at § 2(b)(5).  Congress "reject[ed] the standards created by the Supreme Court . . . [establishing] that the terms 'substantially' and 'major' in the definition of disability under the ADA 'need to be interpreted strictly to create a demanding standard for qualifying as disabled." *Id.* at § 2(b)(4)

Accordingly, the ADAAA provides that "the definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter," and "the term 'substantially limits shall be interpreted consistently with the findings and purposes of the [ADAAA]."  42 U.S.C. § 12102(4)(A), (B).

The ADA has retained the same original definition of "disability" under the first prong, *see id.* at § 12102(1), but now clarifies that for purposes of considering actual impairments "a major life activity . . . includes the operation of a major bodily function, including but not limited to . . . circulatory" functions, *id.* at § 12102(2)(B). *See also* 29 C.F.R. § 1630.2(h)(2)(i)(1(ii)

(defining impairment to include "[a]ny physiological condition or disorder . . . affecting one or more body systems, such as . . . cardiovascular.")  The operation of a major bodily function includes "the operation of a single organ within a body function."  29 C.F.R. § 1630.2(h)(2)(i)(1)(ii).  Furthermore, "[t[he determination of whether an impairment substantially limits a mjor life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . mediation," 42 U.S.C. § 12102(4)(E)(i)(I), though "the non-ameliorative effects of mitigating measures, such as negative side effects of medication . . . may be considered."  29 C.F.R. § 1630.2(j)(4)(ii)

The ADA defines "disability" to include being "regarded as" having a physical or mental impairment that substantially limits one or more major life activities.  42 U.S.C. § 12102(1)(C).  However, the ADAAA substantially altered the standard by which this aspect of ADA coverage is analyzed.  As amended, the statute now provides that an individual meets the requirement of being regarded as having such an impairment "if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  *Id.* at § 12102(3)().

By its plain terms, the statute as amended takes the emphasis in the regarded-as analysis away from the level of impairment that the individual experiences, or that the employer believes the individual to experience.  Instead, the focus is on whether or not the employer took action against the individual because of an actual or perceived impairment, "whether or not the impairment limits or is perceived to limit a major life activity."  *Id.* (emphasis added).  This standard is in stark contrast to the standard prior to the ADAAA, where the focus of the inquiry was on whether the employer perceived the individual to have a substantially limiting

impairment. *See, e.g., Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999) (individuals may fall within the statutory definition for regards-as coverage if "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities."). With the ADAAA, Congress expressly rejected this approach. *See* ADAAA, , at § 2(b)(3) ("[R]eject[ing] the Supreme Court's reasoning in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) with regard to coverage under the [regarded-as] prong of the definition of disability.").

      **1.     Plaintiff suffered from the disabilities of ADHD, depression, anxiety, and dyslexia, or was regarded as being disabled by Defendant**

      In this case, Plaintiff has produced evidence that her employer created several embarrassing situations for her. There was a role-playing instance at an annual sales training meeting, in a conference room with all the sales reps. Kesha Baham was the sales rep acting as the physician. Some of the negative, disparaging remarks made to Plaintiff by her supervisor, O'Sullivan, and in front of her co-worker, were: "You can't read. There is no way that you can be performing like that by yourself. You have to be getting help from someone." Other sales reps were not engaging in the same role-playing exercise with management. Other sales reps were not chosen for that exercise: only Plaintiff. She was the only rep that worked with O'Sullivan. The comments after the exercise embarrassed her so that she doesn't know what else happened after that point. Management didn't do things to confuse other sales associates; only Plaintiff. They discussed it. And management would change her call list just before Plaintiff was to make those calls; creating confusion on Plaintiff's part. It took her longer to prepare for these calls, and management knew it. They would do things to try to confuse her.

They would ask her questions to see if she changed her answer and how well she knew her product.

### 2. Plaintiff was qualified to perform the requirements of her position

To meet the second prong of the analysis, the facts demonstrate that Plaintiff was otherwise qualified to perform the requirements of her position without any reasonable accommodation. *Monette,* 90 F.3d at 1186; *Burress,* 2011 U.S. Dist. LEXIS 92668 *41-42.

Plaintiff was clearly qualified to perform the requirements of her position: she remained employed with Defendant from 2006 until 2011. She received the standard annual increases, and in 2009, applied for and received, a promotion to Senior Specialty Sales Representative. Plaintiff testified that the majority of her time spent calling on doctors was by herself; she was working alone 95% of her time. If she had not been qualified, Defendant certainly would not have allowed her such independence.

### 3. Defendant failed to accommodate Plaintiff

A reasonable accommodation is one that is ordinarily reasonable, or reasonable in most cases. *Riel v. EDS Corp.*, 99 F.3d 678, 683 (5th Cir. 1997). To establish that an employer failed to participate in the interactive process, a disabled employee must prove: "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith" *Id.* at 319-20 (citing *Mengine,* 114 F.3d at 420; *Bultemeyer v. Fort Wayne Comm. Sch.,* 100 F.3d 1281, 1285 (7th Cir.1996); *Taylor v. Principal Fin. Group, Inc.,* 93 F.3d 155, 165 (5th Cir.1996)). On the other hand, employers can demonstrate that they participated in good faith in the interactive process by showing, for example, that they met with

the employee who requested the accommodation, requested information about the condition and what limitations the employee has, asked the employee specifically what she wanted, that they considered the employee's request, and offered and discussed available alternatives when the request is too burdensome. *Id.* at 317 (citing 29 C.F.R. pt. 1630, app. § 1630.9).

Defendant did not in good faith accommodate Plaintiff. Sales requested that they allow her extra time to prepare for presentations, and that someone from management edit and/or proofread her e-mails before they were sent out. Plaintiff's manager with IMPAX, Amy Hyde, did agree to proofread Plaintiff's e-mails. But IMPAX was not her employer; Defendant was. And Defendant denied Plaintiff's requests for accommodation. Not only did Defendant deny her accommodations, when the opportunity arose through the false allegations of a rival sales rep employed by Pfizer, Defendant jumped at the chance and fired Plaintiff.

**B.      Defendant's supposed business decision is pretextual**

An employee may demonstrate that an employer's proffered, non-discriminatory reasons for an adverse employment action are pretextual by revealing the "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's explanation. Three of the most common ways to undermine an employer's proffered reasons include: (1) establishing that the proffered reasons have no basis in fact, (2) establishing that the proffered reasons did not actually motivate the adverse employment action, or (3) establishing that the proffered reasons were insufficient to motivate the adverse employment action.

Pretext may be shown either directly by persuading the trier of fact that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of belief. *Smith v. Chrysler Corp.*, 155 F. 3d 799, 805-806 (6th Cir. 1998) In other words, the plaintiff can establish pretext if the employer's stated reason

for action had no basis in fact, did not actually motivate the decision, **or was never used in the past**. *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 120 S.Ct. 2097 (2000).

In this case, Defendant received third-hand allegations of Plaintiff's alleged wrongdoings: leaving Business Reply Cards to be signed by physicians, when the policy was that the cards had to be signed in the presence of the rep, and leaving her real estate business card with a physician's office, purportedly creating a "commingling" of two products, or "misrepresentation." The allegation was e-mailed by a rival sales rep, promoting the same product as Plaintiff. No one interviewed Plaintiff to hear her side. The two members of management who "investigated" the allegation placed phone calls to physicians' office staff and took their word as verbatim. There were no in-person interviews. There was no tangible proof. And the worst infraction was that there was <u>no policy of Defendant</u> stating that either was an immediately terminable offense. There was testimony from management that, indeed, he determined Plaintiff did <u>not</u> misrepresent herself. It was more a conflict of interest, because of two competing products. In fact, there was mention in Defendant's investigative report that the physician's office involved had actually stated that Plaintiff left her personal business card because she stated she did not have one with her from her employer, inVentiv. By Defendant's own testimony, it was clear that Plaintiff was terminated on trumped-up charges.

## C. Plaintiff Has Met the Burden of Proof to Establish Race Discrimination

To establish a *prima facie* case of gender discrimination, Plaintiff must prove that: (1) she was a member of a protected class; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by person outside the protected class, or similarly situated non-protected employees were treated more favorably. *Grace v. USCAR,* 521 F.3d 655, 677 (6th Cir. 2008).

One of the more common ways available to satisfy the McDonnell-Douglas standard set forth above is to rely on showing that similarly situated employees not in the plaintiff's protected category were treated better or were not subjected to the same policy standards. Development of Sixth Circuit case law on similarly situated employees requires only that a plaintiff "….prove that all of the relevant aspects of her employment situation were 'nearly identical' to those of the comparable." *Pierce v. Commonwealth Life Insurance Company*, 40 F. 3d 796 (6th Cir. 1994). This analysis was refined by the Court in *Ercegovich v. Goodyear Tire and Rubber Company*,:

> The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly situated; rather, as this court has held in *Pierce*, the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects. 154 F.3d 344, 352 (6th Cir. 1998)(citing *Pierce*, supra at 802)

Plaintiff may prove her case by direct evidence of discrimination or indirect evidence. The direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both. If a plaintiff can produce direct evidence of discrimination then the *McDonnell Douglas* paradigm is of no consequence. An employer's discriminatory statements may form the basis for an inference of discrimination and establish pretext. *Ash v. Tyson*, 546 U.S. 454, 126 S.Ct. 1195 (2006). Furthermore, criticism of an employee's performance, even if true, which is linked to stereo types associated with plaintiff's membership in a protected class, falls precisely in the realm of the mixed motive analysis. *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989). Similarly, if a plaintiff attempts to prove its case using the *McDonnell Douglas* paradigm, then the party is not required to introduce direct evidence of discrimination. Under such a theory, plaintiff must prove that she was subjected to different treatment because of her membership in a protected category. While proof of disparate treatment

may be by direct evidence of discriminatory motive for the adverse action, such cases generally require indirect evidence from which an inference of discrimination may be drawn.

In this case, Plaintiff was charged with leaving behind Business Reply Cards for physician signature after the fact. Plaintiff has produced evidence that other inVentiv sales reps had been leaving Business Reply Cards with physicians' offices (at least two other female Caucasian reps: Hauser and Nicole from New Orleans). Both of those reps bragged about the process. Neither was investigated or terminated.

Further, when the position of Regional Sales Training Manager became available, Plaintiff informed her managers that she wanted to apply for the job. She was discouraged from doing so; was told she was not a candidate that inVentiv would like to see a new hire work with. It was because of the way she verbalizes things, because of her focus. She was told by her managers that it was coming from upper management. The individual who <u>was</u> hired for the position, O'Sullivan (a Caucasian female), began with inVentiv when Sales did. From what Sales knew of O'Sullivan's work history, Sales felt they were equally qualified. They had the largest territories; their numbers were consistent. But Sales was told she wasn't someone management wanted in the position.

Under the *McDonnell Douglas* test, a plaintiff has the burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981). The burden of establishing a *prima facie* case is not onerous. *Id.* The case may be proven by showing that an employer took an adverse employment action under circumstances, which give rise to an inference of unlawful discrimination. *Beaver v. Commonwealth of Kentucky*, 783 F. 2d 672, 675 (6th Cir. 1986).

One of the more common ways available to satisfy the *McDonnell-Douglas* standard is to rely on showing that similarly situated employees not in the plaintiff's protected category were treated better or were not subjected to the same policy standards. Development of Sixth Circuit case law on similarly situated employees requires only that a plaintiff prove that all of the relevant aspects of her employment situation were similar to those of the comparable as not by the Sixth Circuit in *Ercegovich v. Goodyear Tire and Rubber Company,* 154 F.3d 344 (6th Cir. 1998):

> The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly situated; rather, as this court has held in *Pierce*, the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects.

154 F.3d 344, 352 (6th Cir. 1998)

## D.      Defendant Retaliated Against Plaintiff for Complaints of Discrimination

*Ms. Sales has come forward with circumstantial evidence of illegal retaliation.* As the U.S. Supreme Court has noted, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace v. Costa*, 539 U.S. 90, 100 (2003) (citing *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 508 n. 17 (1957)). To establish a prima facie case of retaliation based on circumstantial evidence, Plaintiff must demonstrate that: (1) she engaged in protected activity; (2) which was known to Defendant; (3) she suffered an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action. *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 363 (6th Cir. 2001). The burden of establishing a prima facie case of retaliation is not onerous, but one easily met. *Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 413 (6th Cir. 1999). On this point, the Sixth Circuit has held that "caution should be exercised in granting

summary judgment once a plaintiff has established a prima facie inference of retaliation through direct or circumstantial evidence. *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 564 (6th Cir. 2004).[1]

Once a plaintiff establishes a prima face case of retaliation, the burden of production shifts to the defendant to articulate a legitimate non-retaliatory explanation for the adverse employment action. Id. at 563. Should the defendant meet its burden of production, the burden shifts to the plaintiff to establish that the proffered reasons are pretextual. Id. at 564.

Importantly, evidence offered by Ms. Sales to establish causation may also serve to establish pretext. *Cantrell v. Nissan North America, Inc.*, 145 F. App'x 99, 108 (6th Cir. Aug. 1, 2005) (holding "the same circumstances which established a causal connection between [the employee's] protected activity and her termination also serve as sufficient evidence" of pretext); *Wooley v. Madison County, Tennessee*, 209 F. Supp. 2d 836, 848 (W.D. Tenn. 2002) (holding same evidence used to establish causation could be used to establish pretext); *Long v. Procter & Gamble Mfg. Co.*, 2005 WL 2491551, at *6 (W.D. Tenn. Oct. 6, 2005) (same). In particular, the Sixth Circuit has held that demonstrating a causal connection between protected activity and the adverse employment action necessarily rebuts any alleged legitimate, nonretaliatory reason. *Cantrell*, 145 F. App'x at 108 n.2. Thus, the evidence offered by Ms. Sales to establish a causal connection between her protected activity and the adverse actions she suffered also serves to establish pretext on Defendant's part.

Ms. Sales was first confronted about the allegations against her, during a multi-party conference call on February 9, 2011. During that call, she vehemently denied ever leaving

---

[1] This Court has previously cited *Singfield* for this proposition. *See Jeffrey Longs v. Ford Motor Co.*, W.D. Tenn. Case No. 2:07-cv-02653-JPM-cgc, Doc. 138: Order Denying Defendant's Renewed Motion for Judgment as a Matter of Law, at 8). As this Court noted in *Longs*, making factual determinations regarding an employer's retaliatory motives is unsuitable at the summary judgment stage or judgment as a matter of law stage.

Business Reply Cards with physicians, and adamantly stated that she left only one realtor card. Also during that call, there was absolutely no mention by Defendant of termination or even the possibility of termination. Defendant's management has testified to that. Plaintiff was shocked by the allegations, and during that call, told management that she had been discriminated against. Plaintiff has presented evidence that four days later, on February 13, 2011, management decided to terminate Ms. Sales, and the next day, February 14, 2011, did, in fact, terminate Ms. Sales during a follow-up telephone call. She was fired in retaliation for having claimed discrimination.

As an initial matter, a causal connection (as well as pretext) may be established by temporal proximity alone. Indeed, "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purpose of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *see, e.g., DiCarlo v. Potter*, 358 F.3d 408, 421-22 (6th Cir. 2004) (holding that two-to-three week period between when employer learned of protected activity and took adverse action was sufficient evidence of causation).

However, even if the Court requires additional evidence of causation/pretext, **Ms. Sales offers such additional evidence in this case, which buttresses her temporal proximity argument.** *See, e.g., DeBoer v. Musashi Auto Parts, Inc.,* 124 Fed. Appx. 387, 393 (6th Cir. 2005) ("[s]uspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence."). With respect to "additional evidence" of causation/pretext, Plaintiff submits that after complaining of discrimination, she was fired five days later. It is well settled that evidence that the defendant treated the plaintiff differently from similarly situated employees is relevant to causation. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

In *Univ. of Texas Sw. Med. Ctr. v. Nassar,* 2013 WL 3155234 (2013) the United States Supreme Court, based upon principles of statutory construction, held that the standard for proving causation in Title VII retaliation cases is the "but for" standard, as opposing to the motivating factor standard. The *Nassar* case involved the burden-shifting analysis utilized in Title VII cases when a Plaintiff presents circumstantial evidence of discrimination. The Court ultimately held that the "mixed motive" method of proof available to plaintiffs who allege claims of status discrimination (i.e.: race or age) is not available to plaintiffs alleging retaliation under Title VII.

The *Nassar* case should not alter the outcome in this case. A "but for" standard is not a sole cause standard. See *Miller v. American Airlines*, Inc., 525 F.3d 520, 525 (7th Cir. 2008); *Jones v. Oklahoma City Public Schools*, 617 F.3d 1273, 1277 (10th Cir. 2010)(reversing trial court, which engaged in a "pretext-plus" analysis). In the case of *Dunn v. Automotive Finance Corp., et al.,* Case No. 3:11-cv-01079 (M.D. Tenn. July 2013), attached as Exhibit 6, the Court dispensed of a Defendant's attempt to rely upon *Nassar* to unduly limit the ability of a retaliation plaintiff to prove liability. In *Dunn*, the court was faced with a Plaintiff who had been terminated for engaging in protected activity but also evidence from other witnesses that he had himself engaged in policy violations in the workplace. The Court determined it was a jury question as to what motivated the employer's decision to terminate. *Id.* at 21-22.

An employer's deviation from standard, normal procedures when taking an employment action may also be used to establish pretext. *Skalka v. Fernald Environmental Restoration Management Corp.*, 178 F.3d 414, 422 (6th Cir. 1999), *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 590 (6th Cir. 2009)(stating that when an employer waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up his true, longstanding motivations for firing

40

the employee, the employer's actions constitute the very definition of pretext).  The evidence is clear that Defendant deviated from its policy to terminate her.

**IV.    CONCLUSION**

Therefore, Plaintiff submits there are genuine issues of facts, as Plaintiff complained of her disability to her managers and human resources, and complained of discrimination and retaliation of her race and disability and was terminated for her complaints.

Respectfully submitted,

/s/  Andy L. Allman
Andy L. Allman, BPR No. 17857
ANDY L. ALLMAN & ASSOCIATES
103 Bluegrass Commons Blvd.
Hendersonville, TN 37075
Telephone:   (615) 824-3761
Facsimile:    (615) 264-2720
andy@andylallman.com

*Counsel for Plaintiff, Yolanda Sales*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing has been forwarded by electronic means via the Court's electronic filing system this 4th day of April, 2014.

J. Christopher Anderson, Esq.
Rachel R. Rosenblatt, Esq.
LITTLER MENDELSON, P.C.
333 Commerce Street, Suite 1450
Nashville, Tennessee  37201

/s/Andy L. Allman
Andy L. Allman