# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| YOLANDA SALES, ) | |
| ) | |
| Plaintiff, ) | Case No. 3:13-cv-0064 |
| ) | Judge Trauger |
| v. ) | |
| ) | |
| INVENTIV HEALTH, INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Pending before the court is a Motion for Summary Judgment filed by the defendant, inVentiv Health, Inc. ("inVentiv") (Docket No. 25), to which the plaintiff, Yolanda Sales, has filed a Response in opposition (Docket No. 33), and the defendant has filed a Reply (Docket No. 42). Also pending is the defendant's Motion to Strike (Docket No. 39), to which the plaintiff has filed a Response in Opposition (Docket No. 40). For the reasons discussed herein, the defendant's Motion to Strike and its Motion for Summary Judgment will be granted.

## MOTION TO STRIKE

In support of its Motion for Summary Judgment, the defendant filed a Statement of Undisputed Facts ("DUSF") ("Docket No. 27). In support of her opposition to the motion, the plaintiff filed a Response to the DUSF (Docket No. 35) and a separate additional Plaintiff's Statement of Undisputed Material Facts ("PSUMF") (Docket No. 36). The PSUMF, which the defendant has moved to strike as procedurally defective, contains 117 paragraphs of "facts."

In relevant part, Local Rule 56.01 states:

> Any party opposing the motion for summary judgment must respond to each fact set forth by the movant . . . Such response shall be filed with the papers in

1

opposition to the motion for summary judgment. In addition, the non-movant's response may contain a concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried.

The PSUMF does not comply with this rule in any respect.

First, while Local Rule 56.01 permits a party opposing a motion for summary judgment to file a statement of additional material facts that are *in dispute*, the rule does not permit a non-moving party to file a statement of additional *undisputed* facts. Upon review of the PSUMF and the defendant's responses thereto, the court concludes that it is procedurally improper. The defendant does not dispute any of the facts set forth by the PSUMF.[1] Indeed, the PSUMF is titled by the plaintiff as a statement of "undisputed" facts.

Moreover, as the defendant points out, the PSUMF fails to meet the Local Rule's requirement of brevity. The PSUMF includes at least two redundant facts which had been addressed in the DUSF. (Docket No. 43 ¶¶ 6, 61.) Additionally, the PSUMF includes a handful of speculative legal conclusions that are improperly included as facts. (*See, e.g.*, Docket No. 43 ¶ 117 ("inVentiv retaliated against her, because after she complained of discrimination, she was immediately fired.").)

For these reasons, by the express language of the rule, the PSUMF is procedurally improper. The court has the inherent power to strike filings that do not comply with court rules. *See, e.g.*, *Anthony v. BTR Auto. Sealing Sys.*, 339 F.3d 506, 516 (6th Cir. 2003); *Ogle v. BAC Home Loans Servs. LP*, No. 2:11-cv-540, 2011 WL 3838169, at *2 (S.D. Ohio Aug. 29, 2011).

---

[1] The court notes that the defendant challenges some "undisputed facts" set forth by the plaintiff as unsupported by the record or immaterial to the defendant's motion, but the defendant does not dispute those facts.

Accordingly, the court will strike the PSUMF from the record and will not consider the PSUMF for purposes of the defendant's Motion for Summary Judgment.

## BACKGROUND

### I. Overview[2]

Defendant inVentiv is a healthcare company that provides a sales force and operational services to clients in the pharmaceutical industry, including Impax Pharmaceuticals ("Impax"). Impax contracted with Pfizer, a large drug manufacturer, to promote Pfizer's drug, Lyrica, to physicians. Lyrica is a Schedule V controlled substance prescribed by physicians to treat pain and seizures.[3]

In June 2006, inVentiv hired the plaintiff, Yolanda Sales, as a Specialty Sales Representative assigned to its Impax contract. Sales is an African-American female. At the time that she was hired by inVentiv, Sales had four months of pharmaceutical sales experience. Sales was promoted to Senior Specialty Sales Representative in July 2009.

### II. Business Reply Card Program

Sales' job as a sales representative required her to visit physicians' offices and encourage them to prescribe certain drugs, including Lyrica, to their patients. Because Lyrica is a controlled substance, inVentiv sales representatives are prohibited from distributing Lyrica

---

[2] The facts are drawn from the defendant's Statement of Undisputed Facts and the plaintiffs' responses thereto (Docket Nos. 27, 35), as well as the exhibits filed by the parties in support of their briefs (Docket No. 25, Exs. A-H; Docket No. 36, Exs. 1-5; Docket No. 42, Ex. A).

[3] Controlled substances are defined by the Controlled Substances Act, 21 U.S.C. § 801 *et seq*. ("CSA"). The CSA defines what drugs are subject to control of their manufacture and distribution and lists these drugs in schedules, with different provisions pertaining to each schedule. In accordance with the CSA, the distribution of Lyrica samples is regulated by the Drug Enforcement Agency and governed by state regulations.

samples directly to physicians.  Instead, sales representatives carry Business Reply Cards ("BRCs") when they meet with physicians.  The BRCs are preprinted to represent that the physician is a valid healthcare practitioner, has a valid number assigned by the Drug Enforcement Agency ("DEA"), and has a valid state license number.  Pursuant to inVentiv and Impax procedures, if a physician wishes to order samples of Lyrica, the physician must sign the BRC in the sales representative's presence.  The sales representative then must mail the signed BRC to a third-party vendor, and samples are subsequently shipped directly to the prescriber.  Without a physician's signature, a BRC will be rejected.

Sales received training on the BRC program and admits that she was required to follow its procedures related to BRCs.  It is undisputed that Sales knew, for instance, that leaving unsigned BRCs at a physician's office, or permitting staff at a physician's office to obtain a physician's signature, violates inVentiv and Impax policy.

### III. Conflict of Interest Policy

inVentiv's employee policies also prohibit employees from serving in other employment positions that would conflict with their duties during the time that they were representing inVentiv in the field.  Scott Miller, inVentiv's Director of Commercial Compliance, testified at his deposition that, in his experience, when inVentiv employees have violated the conflict of interest policy, they have been terminated for cause without exception.  (Docket No. 25, Ex. 6.)

At some point in time during her employment at inVentiv, Sales obtained a real estate license.  Sales carried personal realtor business cards with her picture and real estate company, Crye-Leike, printed on the business cards.

### IV. Sales' Alleged Disabilities

Sales allegedly suffers from ADHD, dyslexia, depression, and anxiety. It is undisputed that Sales verbally informed her supervisors, Sharon O'Sullivan, Renee Pauley, and Graham Partington, about her ADHD. It is also undisputed that Sales verbally informed O'Sullivan about her depression and dyslexia. However, Sales admits that she never provided her supervisors with medical documentation of her alleged disabilities and that she did not inform any of her supervisors at inVentiv about her anxiety.

## V. Investigation into Sales' Conduct

On February 3, 2011, Tom Ciampa, Impax's Pharmaceuticals Director of Sales Operations, forwarded two emails from Pfizer to Miller, Felecia Harrison, inVentiv's Human Resources Manager, and Mike Shafranski, inVentiv's National Business Director. Ciampa wrote:

> Scott/Felecia, I received the below email from Pfizer regarding potentially improper activities by a Ventiv [sic] representative on behalf of Impax Pharmaceuticals and would like you to initiate an investigation immediately. Pfizer has provided the attached non-Impax business card left by one of our representatives – Yolanda Sales in the Nashville, TN territory.

(Docket No. 25, Ex. 3 at 4.) The underlying email, originating from Pfizer employees Jeffrey Humphrey and Mark Bernstein, asserted that Sales may have engaged in improper activities by leaving a realtor card at a physician's office during a sales call and leaving a stack of unsigned BRCs with a nurse or receptionist for a physician to sign and mail in directly.

On February 7, 2011, Ciampa forwarded a detailed email to Miller, Harrison, and Shafranski, summarizing the allegations of misconduct by Sales and passing along contact information for various physicians' offices where Sales' misconduct had allegedly occurred. The forwarded email appears to have been sent by a Pfizer representative and includes addresses and names of the staff at the physicians' offices. The email further notes that Sales left unsigned

5

BRCs with a receptionist on every sales call at the office, which amounts to a frequency of once every other week. (*Id.*, Ex. 3 at 2-3.)

On February 8, 2011, Miller and Harrison contacted the physicians' offices to investigate the BRC and realtor card allegations. In their investigative report, Miller and Harrison wrote that employees in three different physicians' offices verified that Sales had repeatedly left unsigned BRCs at their offices for physicians to sign and mail to the third-party vendor. Additionally, a nurse at the office of Dr. Lee informed Miller and Harrison that Sales had given her a realtor business card because she did not have any Impax business cards at the time. (*Id.*, Ex. 3 at 11.)

On February 9, 2011, Miller, Harrison, Shafranski, and O'Sullivan called Sales to discuss the allegations against her regarding BRCs and her realtor business card. During that call, Sales denied leaving an unsigned BRC with any physician or office staff. Also during the call, Sales admitted to her supervisors that she had given one realtor business card to a physician, but she claimed that the physician—not Dr. Lee—was her friend and had requested the realtor business card. The report further notes that Sales told her supervisors that her last visit to Dr. Lee's office was in December 2010 and that she had not left a realtor business card with anyone in Dr. Lee's office. The report states that, when her supervisors asked where or why these allegations may have been made, Sales asserted that perhaps her coworkers wanted her job due to the economy. According to the report, towards the end of the call, Sales stated that she felt insulted and felt that she was being discriminated against.

On February 14, 2011, Miller completed an investigative report summarizing his findings. The same day, Harrison terminated Sales and told Sales that she was being fired for violating inVentiv policy regarding BRCs and improper representation while conducting company business. Harrison also sent a letter to Sales, dated February 14, 2011, reiterating the

reasons for Sales' termination and expressly stating: "Your termination is a direct result of your violation of company policy as it pertains to BRC procedures and improper representation while conducting company business." (Docket No. 25, Ex. 2 at 58.)

## VI. The Action

Around August 9, 2011, Sales filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that inVentiv discriminated against her and retaliated against her on the basis of a disability. On January 28, 2013, Sales filed a Complaint in this court against inVentiv, alleging that (1) inVentiv failed to promote her and terminated her in violation of the Civil Rights Act of 1991, 42 U.S.C. § 1981 ("Section 1981"); (2) inVentiv terminated her and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); (3) inVentiv discriminated against her and terminated her because of her disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), and the Tennessee Disability Act, T.C.A. § 8-50-103[4] ("TDA"); (4) inVentiv violated the Equal Pay Act, 29 U.S.C. § 206 ("EPA"), by paying the plaintiff less than her male counterparts for equal work; and (5) inVentiv retaliated against Sales in violation of the Tennessee Human Rights Act, T.C.A. § 4-21-101 *et seq.* ("THRA"). inVentiv filed the pending motion on March 7, 2014. The plaintiff responded to the defendant's motion on April 4, 2014, conceding her EPA claim and opposing the defendant's motion as to her four remaining claims. (Docket No. 33.)

---

[4] The court notes that the plaintiff improperly asserted a claim under the Tennessee Handicap Act in her Complaint. The TDA was formerly known as the Tennessee Handicap Act. Effective April 7, 2008, the legislature amended the statute, changing all references to "handicap" within the Act to "disability," including changing the name. *See* 2008 Tenn. Pub. Acts, ch. 706, §§ 3, 5; *see also Bennett v. Nissan N.A., Inc.*, 315 S.W.3d 832, 841 n.6 (Tenn. Ct. App. 2009).

7

# SUMMARY JUDGMENT ANALYSIS

## I.  Rule 56 Standard

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252.  An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## II.  The *McDonnell Douglas* Analysis

As an initial matter, Sales' four remaining claims are analyzed employing the familiar burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973), and later refined by *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

The *McDonnell Douglas* framework is properly used where a plaintiff uses indirect or circumstantial evidence to demonstrate that an employer acted with a retaliatory or discriminatory motive. If the plaintiff makes a *prima facie* showing, "the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Clay v. United Parcel Serv.*, 501 F.3d 695, 704 (6th Cir. 2007). To meet this burden, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for its decision. *Id.*; *see also Berry v. City of Pontiac*, 269 F. App'x 545, 549 (6th Cir. 2008). If the defendant is successful, the burden then "shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination." *Bryson v. Regis Corp.,* 498 F.3d 561, 570 (6th Cir.2007). To make this showing, Sales retains the ultimate burden of producing "sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that [the defendant] intentionally discriminated against [her]." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001).

### III. Failure to Exhaust Administrative Remedies as to Title VII Claims

Sales alleges that inVentiv discriminated against her and retaliated against her due to her race in violation of Title VII. Title VII "specifies with precision the prerequisites that a plaintiff must satisfy before filing suit." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002). One such prerequisite is that

> [a]n individual must file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") within the statutory time period and serve notice upon the person against whom the charge is made. In a State that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the

9

charge with the EEOC within 300 days of the employment practice; in all other States, the charge must be filed within 180 days. A claim is time barred if it is not filed within these time limits.

*Id.* (citing 42 U.S.C. § 2000e-5(e)(1)). inVentiv argues that, here, Sales failed to include any claim of race discrimination or retaliation in her EEOC Charge and, accordingly, her Title VII claims are procedurally improper and time-barred.

The court agrees. Sales' EEOC Charge limits her allegations of unlawful employment practices to unspecified disabilities. (Docket No. 25, Ex. 2 at 51.) Moreover, in response to the defendant's argument that she failed to exhaust her administrative remedies as to her Title VII claims, Sales does not address the procedural defect or the substance of her Title VII claims. For these reasons, Sales' race discrimination and retaliation claims under Title VII are procedurally defective and summary judgment is appropriate for inVentiv as to the plaintiff's Title VII claims.[5]

## IV.    Section 1981 Discrimination Claim

Sales alleges that inVentiv violated Section 1981 by failing to promote her and terminating her as part of a "knowing and intentional pattern" of racial discrimination. Section 1981 prohibits racial discrimination in private employment. Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."

---

[5] It concerns the court that the plaintiff's counsel brought Title VII race discrimination and retaliation claims in the first place (having not included them in the EEOC Charge), continued to pursue these defaulted claims after discovery, and, even after the defendant filed its instant motion, failed to concede explicitly that summary judgment on these claims was appropriate.

10

42 U.S.C. § 1981(a) (2012). Thus, the statute "prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors." *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir.2006); *see also Runyon v. McCrary*, 427 U.S. 160, 173 (1976) ("Section 1981 . . . reaches private conduct.") Section 1981 claims are reviewed under the same standards as claims of race discrimination brought under Title VII. *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999).

To establish a *prima facie* case for a Section 1981 discrimination claim, a plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment. *Johnson v. Kroger*, 319 F.3d 858, 864-65 (6th Cir. 2003). If a plaintiff relies on circumstantial evidence, as Sales does here, the court applies the *McDonnell Douglas* burden-shifting framework. *See Michael v. Caterpillar Fin. Serv. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007).

**A. Indirect Evidence of Racial Discrimination**

Pursuant to the *McDonnell Douglas* framework, Sales must first produce evidence to establish a *prima facie* case of racial discrimination. *Caterpillar*, 496 F.3d at 593. To do so, she must demonstrate that (1) she is a member of the protected class; (2) she was qualified for her position; (3) she was subject to an adverse employment action; and (4) she was treated differently than similarly situated employees outside the protected class for the same or similar conduct. *Id.* Here, for her claims to survive summary judgment, Sales must set forth a *prima facie* case as to her two claims of alleged discrimination: (1) inVentiv's failure to promote her to a recruiting and sales position; and (2) Sales' termination.

The defendant appears to concede the first three elements of Sales' *prima facie* case but argues that Sales fails to meet her burden to identify similarly situated employees who were

11

treated more favorably than Sales. To make out her *prima facie* case, Sales must produce evidence that, at a minimum, establishes that, for the same or similar conduct, she was treated differently than similarly situated non-minority employees. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir. 1992). The Sixth Circuit has articulated the standard for this analysis as follows:

> It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the "comparables" are similarly situated *in all respects.* Thus, to be deemed "similarly-situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it.

*Id.* at 583. (emphasis in original) (internal citations omitted) (holding that the plaintiff had not provided sufficient facts concerning alleged comparators to demonstrate that they were similarly situated); *accord Clayton v. Meijer, Inc.*, 281 F.3d 605, 610–11 (6th Cir. 2002). Thus, Sales is "required to prove that all of the relevant aspects of [her] employment situation were *nearly identical* to those of [her comparators]." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (internal quotation marks omitted) (emphases added). Accordingly, in the promotion context, Sales must demonstrate that the candidate who received the position was nearly identical to her, but outside of her protected class. In the disciplinary context, Sales and her comparators must have engaged in acts of "comparable seriousness." *Clayton*, 281 F.3d at 611 (finding that truck drivers who, like plaintiff had also pulled a rig away from a loading dock without insuring that back doors were closed were not "similarly situated" to the plaintiff, where resulting harm differed).

The court notes that Sales' Response fails to meaningfully respond to the legal arguments set forth by the defendant concerning her race discrimination claims. Instead, she submits four pages largely consisting of boilerplate legal language regarding the *McDonnell Douglas* standard, without applying the standard to her claims (and the undisputed facts in the record).

**B. Application**

Sales' claims turn on her assertion that she was not promoted because of her race and that inVentiv terminated Sales because of her race.

Upon review of the record, the court concludes that Sales has failed to meet her *prima facie* burden as to each of her claims of racial discrimination because she has failed to identify a similarly situated individual outside of her protected class.

1. Promotion

Sales appears to submit that, because she did not receive a promotion to a recruiting and sales position and because a Caucasian female manager did receive the position, inVentiv discriminated against Sales. Sales appears to identify Sharon O'Sullivan, the Caucasian manager who received the promotion, as a comparator. However, Sales presents no direct evidence to demonstrate that she and O'Sullivan were similarly situated for purposes of the promotion. Instead, Sales appears to rely on allegations that her managers told her that she was not an appropriate candidate for the position and intimated that the decision not to promote her was coming from upper management. (Docket No. 33 at 36.) These allegations do not support the proposition that the plaintiff is required to prove: that all relevant aspects of her employment were "nearly identical" to O'Sullivan's.

Moreover, in her Response to the defendant's motion, Sales appears to confuse her racial discrimination claim with her disability discrimination claim, alleging that her managers told her

13

that she would not be promoted "because of the way she verbalizes things, because of her focus." *Id.* Sales fails to coherently respond to the defendant's legal arguments as to her failure to identify a comparator and also fails to present any evidence that she and O'Sullivan were similarly situated, as required by settled law. Accordingly, Sales' allegations fail to provide even circumstantial evidence of racial discrimination as to Sales' desired promotion, and she has failed to set forth a *prima facie* case for a Section 1981 claim on these grounds.

      2.  Discipline and Termination

Sales also alleges that inVentiv discriminated against her based on her race because it disciplined her and terminated her for leaving unsigned BRCs with physicians and giving a physician's office her real estate business card. At her deposition, Sales identified three possible comparators—Jeff Humphrey, Vickie Hauser, and "Nicole from New Orleans"—whom she alleges frequently left unsigned BRCs with physicians' offices and bragged about it.[6] However, Sales admitted at her deposition that Humphrey is *not an inVentiv employee* and, therefore, cannot be considered her comparator. Moreover, Sales has presented no evidence that management knew of any other inVentiv sales representatives, including Hauser and "Nicole,"

---

[6] In its Reply, the defendant notes that, during her deposition, inVentiv's counsel asked the plaintiff *six* times whether she knew of other employees, besides Jeff Humphrey, who left unsigned BRCs with physicians, and she answered no each time. However, after returning from an hour-long lunch break, the plaintiff curiously remembered two other employees who left unsigned BRCs with physicians. Although such a delayed recollection is within the realm of possibility, the court is reminded of the Advisory Commission's Comment to the 1995 Amendment to Tennessee Rule of Civil Procedure 30.03. "Some courts have reminded the bar that a deposition is a formal judicial proceeding—albeit absent a presiding judge—and consequently consultations between counsel and deponent during questioning are not to be tolerated any more than it would be in the courtroom." Tenn. R. Civ. P. 30.03 (2014); *see* Fed. R. Civ. P. 30(c) (directing that examination and cross-examination at depositions proceed as permitted at trial); Wright & Miller, *Federal Practice & Procedure* § 2113 (3d ed. 2013).

that had left unsigned BRCs with physicians. Sales further fails to identify a single comparator who, in addition to leaving unsigned BRCs with physicians, also violated the company's conflict of interest policy by giving a physician a business card from a second job while representing inVentiv and Impax. Accordingly, Sales has failed to demonstrate that she and other representatives who allegedly violated policy were identical in all relevant respects. Finally, even if Sales had successfully established a *prima facie* case of racial discrimination based upon her termination, Sales has failed entirely to address her burden to establish pretext in the face of inVentiv's legitimate non-discriminatory reason for her discipline and termination.

Sales has failed to set forth a *prima facie* case of discrimination as to her allegations that inVentiv failed to promote her and terminated her because of her race. Accordingly, summary judgment is appropriate for the defendant as to Sales' Section 1981 claim.

## V.     Disability Discrimination Claim

In her Complaint, Sales alleges that inVentiv discriminated against her and terminated her because she was disabled in violation of the ADA and the TDA. The ADA and TDA protect disabled employees and job applicants from discriminatory treatment. *See* 42 U.S.C. § 12112(a). A claim brought under the TDA is analyzed under the same principles as those utilized for the ADA. *Cardenas-Meade v. Pfizer, Inc.*, 510 F. App'x 367, 369 n.2 (noting that the TDA does not require that reasonable accommodation be made).

Under the ADA, no covered entity shall discriminate against a qualified individual with a disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. *Id.* Discrimination under the ADA includes an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise

15

qualified individual who is an applicant or an employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the covered entity." *Id.* at § 12112(b)(5)(A); *see Kleiber v. Honda of Amer. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007). Where, as here, the plaintiff seeks to establish discrimination through indirect, rather than direct, evidence, the Sixth Circuit requires the plaintiff to establish a *prima facie* case, followed by the familiar *McDonnell Douglas* burden-shifting analysis. To establish a *prima facie* case under the ADA, Sales must establish that "(1) she is disabled; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Whitfield v. Tennessee*, 639 F.3d 253, 258 (6th Cir. 2011); *see also Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996).

In its Motion for Summary Judgment, inVentiv contends that Sales cannot establish a *prima facie* case of discrimination because she fails to present evidence as to two elements of her claim. First, inVentiv argues that Sales has not presented evidence that inVentiv knew or had reason to know of her alleged disabilities. inVentiv submits that, although it is undisputed that Sales verbally informed one or more of her supervisors regarding her ADHD, depression, and dyslexia, it is also undisputed that Sales never provided her supervisors with any supporting medical documentation regarding her conditions.[7] (DUSF ¶¶ 23-27.) inVentiv argues that,

---

[7] The court notes that, in the plaintiff's response to the DUSF, the plaintiff's counsel appears to have "disputed" certain facts which are, in reality, undisputed. Paragraph 24 of the DUSF is an example. Paragraph 24, submitted by the defendant, reads: "Ms. Sales informed her supervisors, Sharon O'Sullivan, Renee Pauley, and Graham Partington, about her ADHD, but

16

because it never received medical documentation of Sales' disabilities, Sales cannot establish that inVentiv knew or had reason to know of her alleged disabilities. Additionally, inVentiv argues that Sales cannot establish a *prima facie* case of disability discrimination because she cannot prove that she suffered the adverse employment action because of her disability.[8]

In her Response to the pending motion, for unknown reasons, Sales sharply deviates from her Complaint and appears to assert a new ADA claim for failure to accommodate. However, because Sales failed to plead a failure to accommodate claim in her Complaint, she cannot properly assert a failure to accommodate claim against inVentiv at this stage. Moreover, Sales fails to meaningfully respond to inVentiv's legal arguments regarding her disability

---

never provided them with any supporting medical documentation regarding ADHD." In response, the plaintiff writes: "Disputed. Plaintiff testified that she did not provide medical documentation because they didn't ask for it." Here, the plaintiff is not disputing the fact as submitted by the defendant; she appears to admit that she informed her supervisors of her ADHD but did not provide them with medical documentation. Instead of disputing the fact, the plaintiff's counsel is merely adding context to the fact. Such a distinction is critical at the summary judgment phase and requires careful attention by the non-moving party's counsel—attention that is not evident here.

[8]The defendant cites *Jones v. Potter*, a Sixth Circuit case, for its proposition that, to establish a *prima facie* case of disability discrimination, Sales must demonstrate that she was terminated because of her disability. (Docket No. 26 at 9 (citing 488 F.3d 397 (6th Cir. 2007)).) However, in *Jones*, the Sixth Circuit expressly stated the *opposite* when it analyzed a Rehabilitation Act (not ADA) claim. The appellate court instructed that a plaintiff seeking to establish a *prima facie* case need not show that the adverse employment decision he suffered occurred solely by reason of his disability. Such a requirement, the Sixth Circuit wrote, "imposes too great a burden upon the plaintiff at this early stage of the *McDonnell Douglas* inquiry." 488 F.3d at 406.

discrimination claim.[9] Accordingly, Sales has constructively abandoned her ADA claim as pled in the Complaint, and summary judgment is appropriate for inVentiv as to this claim.[10]

## VI. THRA Retaliation Claim

The analysis of claims brought pursuant to the THRA is identical to the analysis used for Title VII claims. *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 880 n.1 (6th Cir. 2008). In order to establish a *prima facie* case for a THRA retaliation claim, "a plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." *Johnson v. Kroger Co.,* 319 F.3d 858, 864–65 (6th Cir. 2003). To set forth a *prima facie* case of retaliation under the THRA, Sales must establish that (1) she engaged in protected activity, (2) inVentiv knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against her, and (4) there was a causal connection between the protected activity and the adverse employment action.

---

[9] On April 7, 2014, the court granted the plaintiff's counsel leave to file excess pages in the plaintiff's Response to the defendant's motion for summary judgment (Docket No. 34). However, in addition to the deviation from her pleadings and her failure to submit substantive legal arguments in favor of the claims pled in her Complaint, Sales spends a significant portion of her brief reciting boilerplate language as to the legislative history of the ADA and certain ADA legal standards that do not apply to her claims and are not in dispute here. (Docket No. 33 at 25-31.) Despite the plaintiff's counsel's submission of a 41-page memorandum in response to the defendant's motion (and an additional 400 pages of deposition testimony), the court is unable to find a coherent theory of liability as to the plaintiff's disability discrimination claim. The plaintiff's counsel's abuse of the court's leniency is unacceptable and has wasted both the defendant's and the court's time.

[10] Even if the plaintiff had not abandoned her ADA discrimination claim, summary judgment for inVentiv as to the claim would be appropriate because the plaintiff did not establish, with evidence, the requisite elements of her *prima facie* case. Moreover, even if the plaintiff had established a *prima facie* case of discrimination, the plaintiff has failed to submit any evidence of pretext to rebut the defendant's legitimate reason for her termination—her breach of inVentiv's policies.

Sales' THRA claim appears to be premised upon her complaint of discrimination made during her February 9, 2011 call with Miller, Shafranski, O'Sullivan, and Harrison. Sales does not dispute that the purpose of the February 9, 2011 call was to discuss the allegations of misconduct against her. inVentiv argues that, because Sales made this complaint while being investigated for policy violations, Sales cannot establish a causal connection between her protected activity (her complaint of discrimination on February 9, 2011) and her termination.

In response, Sales appears to argue that temporal proximity alone may establish a causal connection between her protected behavior and her termination for purposes of her *prima facie* case.[11] However, while the Sixth Circuit has held that, in some circumstances, "temporal proximity alone would be sufficient to support the inference of retaliatory discrimination," such circumstances clearly are not present here.[12] inVentiv's investigation into Sales' misconduct is well-documented, and it is undisputed that Sales knew that the allegations of misconduct against her constituted violations of her employer's policies. Moreover, Sales presents no additional evidence to raise an inference that her termination was the result of retaliatory discrimination and not a legitimate business reason. Sales has failed to demonstrate a causal connection between her complaint of discrimination and her termination and, therefore, she has failed to set forth a

---

[11] When responding to the defendant's motion as to her THRA retaliation claim, the plaintiff again fails to coherently respond to the defendant's legal arguments. The plaintiff appears to blend her analysis as to her *prima facie* case and pretext, and she also recites inapplicable boilerplate legal language regarding standards of causation without applying the law to her own claims.

[12] *See, e.g.*, *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *see also Blosser v. AK Steel Corp.*, 520 F. App'x 359, 363-64 (6th Cir. 2013) (discussing *Mickey*).

*prima facie* case of retaliation under the THRA.[13]  Accordingly, summary judgment is appropriate for the defendant as to the plaintiff's THRA retaliation claim.

## **CONCLUSION**

For these reasons, the defendant's Motion to Strike and Motion for Summary Judgment will be granted.  An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[13] The court further finds that, even if Sales had set forth a *prima facie* case for retaliation under the THRA, summary judgment on her retaliation claim would still be appropriate. inVentiv has provided a legitimate, non-discriminatory reason for her termination, and Sales has failed to present any evidence of pretext beyond her self-serving deposition testimony.  It is well settled that Sales' conclusory testimony alone is insufficient to support a finding of pretext. *Adams v. Tenn. Dep't of Fin. & Admin.,* 179 F. App'x 266, 274 (6th Cir. 2006).